IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DARRELL HOCHHALTER          )
#533622,                    )
                            )
    Petitioner,          )
                            )          NO.  3:19-01112
v.                          )
                            )          JUDGE CAMPBELL
WARDEN KEVIN GENOVESE,      )
                            )
    Respondent           )

## MEMORANDUM

Petitioner is a state inmate serving an effective sentence of twenty-two years for sexual offenses committed against his daughter.  He filed a pro se Petition for the federal writ of habeas corpus under 28 U.S.C. § 2254 and paid the filing fee. (Doc. Nos. 1, 8.)  The Court will deny his Petition for the reasons set forth below.

## I.      BACKGROUND AND PROCEDURAL HISTORY

On February 21, 2014, a Davidson County jury convicted Petitioner of six counts of sexual battery by an authority figure and one count of rape. (Doc. No. 13-1 at 29.)  The trial court held a sentencing hearing on April 4, 2014, and later sentenced Petitioner to five years in prison for each count of sexual battery and twelve years for rape. (*Id.* at 30, 38–44.)  The court ordered the sentences for rape and one of the sexual battery counts to run consecutively to each other and the other sentences, for a total effective sentence of twenty-two years. (*Id.* at 34–37, 43–44.)

On direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's convictions and individual sentences and remanded to correct the judgment with regard to the rape conviction to reflect that it was a Class B felony rather than a Class C. (Doc. No. 13-15.)  The Tennessee Supreme Court denied Petitioner's request for discretionary review. (Doc. No. 13-18.)

Petitioner, through counsel, filed a petition in state court for post-conviction relief on the basis of multiple instances of ineffective assistance of counsel at trial and sentencing. (Doc. No. 13-19 at 51–62.) The trial court held an evidentiary hearing and denied relief. (*Id.* at 64, 67–93.) The Tennessee Court of Criminal Appeals affirmed the denial of relief, and the Tennessee Supreme Court again denied discretionary review. (Doc. Nos. 13-24, 13-27.)

Petitioner next sought relief in this case, and Respondent acknowledges that the Petition was timely filed. (Doc. No. 20 at 2.) Petitioner subsequently filed a Motion to Amend (Doc. No. 10) in which he simply re-argued the same claims already pending in his Petition, which the Court granted to the extent that the contents of the Motion would be considered as a memorandum in support of his original Petition. (Doc. No. 15.) Respondent filed an Answer to which Petitioner filed a Reply. (Doc. Nos. 20, 23.) This matter is thus fully briefed and ripe for review.

## II.     STATEMENT OF FACTS

The Tennessee Court of Criminal Appeals' summary of the evidence at trial is lengthy, but the Court includes the entire summary in light of Petitioner's claim that the evidence was insufficient to support his convictions:

> This case arises out of the defendant's numerous and various sexual encounters with his daughter, the victim, which occurred between April 22, 2008 and April 16, 2010. As a result, he was indicted for seven counts of sexual battery by an authority figure, one of which was dismissed before trial, as well as one count of rape. The defendant's wife was charged with one count of facilitation of sexual battery by an authority figure, but her case was severed from the defendant's.
>
> At trial, the victim, who was nineteen years old at the time of trial, testified that the defendant was her father, and she had a sister who was four years younger than she. During the time period in question, her mother left for work around 8:30 a.m. and returned home around 5:00 or 6:00 p.m. The defendant worked nights, leaving the home around 2:00 a.m. and returning around 9:00 a.m. Her grandmother also lived in the home, but she primarily stayed in her room downstairs or in the living room and kitchen on the main level. She rarely went to the upstairs level, where the bedrooms were located.
>
> The victim said that she was homeschooled in the sixth grade by the defendant, but

she returned to school for seventh and most of eighth grade. In April or May 2008, during her eighth grade year when she was thirteen years old, the defendant withdrew the victim from school because the victim began cutting herself. The defendant believed the victim's friends were a bad influence on her.

The victim said that she and the defendant had "a great relationship" when she was little, but they grew apart as she became a teenager and wanted to be with her friends. During the time the defendant homeschooled her after withdrawing her from the eighth grade, the victim's and defendant's relationship "was strained but [they] were really close." She elaborated that the defendant "was just trying to relearn [her]."

The victim recalled that, following her removal from school, the defendant would wait in the bathroom while she showered, so he could check her legs afterwards to make sure she had not cut herself. The victim denied that the defendant ever got in the shower with her or touched her in the shower. The victim acknowledged having previously told others that the defendant had taken showers with her in order to conserve water and to make sure she was not cutting herself. She also acknowledged having previously told others that the defendant "would grab [her] boob or smack [her] butt in the shower." The victim denied that the defendant ever got in the bathtub with her. However, she acknowledged previously stating on a number of occasions, including under oath, that the defendant had done so.

After completing her homeschooled eighth grade year, the victim began attending Nashville School of the Arts ("NSA"), and the defendant visited her at school. Someone from the Department of Children's Services ("DCS") spoke with the victim about concerns that had been raised at school concerning her relationship with the defendant. Rumors were going around the school that she had been "making out" with the defendant. The victim told the DCS worker that nothing had happened and that they were just "a very eccentric family." The victim acknowledged that her mother told her to tell DCS that nothing happened in order to protect their family. However, she explained that her mother was referring to the defendant's grabbing her breasts and checking her hymen – the only two things she admitted actually happened. After DCS became involved, the victim's parents blamed her for telling her friends about the sexual abuse, and her parents discussed moving out of state to prevent the defendant from going to prison. The victim recalled that her parents talked about how the victim's "inability to stay quiet about things happening" was going to have legal repercussions.

The victim acknowledged previously stating that she made the decision to disclose the abuse in 2011 because she was worried about her younger sister. At the time of the disclosure, the victim's sister was the same age that the victim had been when the abuse started, and the victim's sister was also being homeschooled. At trial, however, the victim testified, "It wasn't really a concern about sexual abuse, it was just a convenient thing that fit in with my story."

The victim agreed that she had been fearful her mother and sister would blame her if the defendant went to jail, and she was worried about breaking up her family. However, she acknowledged that she had not broken up her family because, at the

time of trial, she was living with her mother, her parents were still together, and she saw the defendant occasionally even though he was not supposed to be around her. However, she denied that the defendant came to her house when she was present. Asked if she wanted to be reunited with the defendant and the family, she responded, "Maybe after a lot of counseling."

The victim claimed that she told stories about the defendant's molesting her in order to make friends at school. She told her friends that she had taken showers and "naked naps" with her father. She elaborated that she told her friends that her father groped her breasts and buttocks during the showers and that he had erections during the naps. She also told them that, on one occasion, the defendant tried to digitally penetrate her vagina. She explained that the defendant "felt down there to see if [she] was aroused" and asked if she "was wet."

The victim stated that, in the tenth grade, she got caught performing oral sex on her boyfriend and was taken out of school. After that, she "used the stories that [she] had been telling [about the defendant] to get out of the house because [she] wanted to be with [her] boyfriend at that time." She said that, after the incident with her boyfriend, the defendant developed "all of these rules" and "beat[ ] the crap out of [her] every morning," so she did not want to be at home and used the stories she had told her friends over the years to get out of the house. She stated that she told Jenny White, her former youth leader, about the alleged abuse because she was afraid of not being able to see her boyfriend again. However, she acknowledged that a few days before she disclosed the abuse to Ms. White, her family had dinner with her boyfriend's family and agreed that she would be able to return to school.

The victim testified that she kept a journal in which she recorded some of the allegations that she told other people. However, she clarified that she "had gone back and written those in." She kept the journal from the ages of thirteen to sixteen, or from the eighth to the tenth grade. She elaborated that she had a "rough draft journal and a final draft journal." The rough draft journal had "all [her] sloppy writing and all of [her] little side notes. And there were pages between them." She later rewrote the journal to look nice so she could give it to her children one day. She claimed that her friends wanted to read her journal, so she "slipped in stuff from [her] stories ... so it would seem more believable."

The victim read a journal entry dated April 6, 2010, in which she noted that one of her boyfriends "was confronting my dad about the molestation thing. I tried to tell [him] that my dad is a good and honest man; he's confused. He's just ignored me of course." She then read another entry that read: "The [D]epartment of Child Services showed up to talk to me at school. Family isn't in trouble but they will document their visit with the family. We didn't tell them any of the things they would consider indecent." The victim then read another post, dated May 14, 2010, that read:

> DCS is coming to see me at school again today. Apparently either "Jade" or Principal Bob are sending letters to them about dad so they have to interview us again . . . but they believe we are innocent. Mom's getting pissed. She says it's harassment so she's going to try

4

to sue Principal Bob for his job if this keeps happening.

The victim testified that after she was caught performing oral sex on her boyfriend at school, she and her boyfriend were taken to the principal's office and given three days suspension each. She recalled that the defendant was "incredibly pissed off." Although the victim was only suspended for three days, the defendant kept her out of school for five days. During that time, the victim had to stay in her room, and "every morning . . . [the defendant] would . . . beat the crap out of [her]." He made her hold onto a bedpost while he beat her with a belt. He told her that he would smack her hand if she let go of the bedpost. He called her "white trash" and said that she "would never amount to anything." The victim sustained bruises from her mid-back to her knees from the beating. After the beatings, the victim went into the bathroom while the defendant showered, and they talked. She recalled that the defendant talked about "how he was going to kill [her boyfriend] and [her boyfriend]'s dad, and the usual, just he was pissed." When the victim was hungry and asked for food, the defendant gave her bread, peanut butter and water, which was the only food she had for several days. As a chore, for punishment, she had to carry cinderblocks or logs back and forth across the yard. She understood that she was being punished because she "had given [her] boyfriend a blow job and that is not what Christian girls do."

After the five days had passed, the defendant allowed the victim to return to school, as well as to church and see her youth leader, Jenny White. The victim told Ms. White that her father had locked her in her room for five days and beaten her every day. She also told Ms. White the same things that she had told her friends about the defendant's molesting her when she was being homeschooled in the eighth grade. The victim admitted that she detailed to Ms. White that the defendant had taken showers with her, touched her private areas, and pressed his penis against her body. She admitted that she additionally told Ms. White that the defendant had made her sleep naked with him and touched her on several occasions when that happened. After the victim talked to Ms. White, Ms. White told her that she was legally obligated to report the defendant's conduct. The victim admitted that she never recanted her story to Ms. White.

Following the disclosure to Ms. White, the victim spoke with a detective and told him the same things she had told Ms. White. She agreed to make a controlled phone call to the defendant because the detective told her that "[i]t would help with the case and with removing [her] from the house." The victim recalled that she later participated in a forensic interview, which was audio and video recorded. She also testified in juvenile court on July 11, 2011, and February 21, 2012.

The victim then read a journal entry from April 12, 2011, in which she said:

> [The defendant] just burst in my room and said I can never kiss him again or even come within an arm's reach of him. And he said that if [my boyfriend] comes anywhere near me or comes anywhere near he will castrate him and shove [my boyfriend]'s nuts down his dad's father's throat. It just [sic] me off because he threatened [my boyfriend] and [his father]. I have a lot of respect for [my

5

> boyfriend]'s family so it's like he threatened my own family when he said that.
>
> Then [the defendant] went on a rant about different ways to kill [my boyfriend]. One of them was [he] could drive a sword through his stomach, pull upwards to his chest and then let go of the sword. [My boyfriend] would take a sharp last breath and the pulling of air into his lungs would pull the sword deeper into his body. [He] would watch the life leave his eyes and pull the sword back out of his chest.

The victim read another excerpt from her journal, dated April 26, 2011, in which she noted that the defendant had become more protective of her since "he pulled [her] out of eight[h] grade for cutting" but that "he did a lot of things that tour [sic] us apart." The excerpt further noted that she realized her mother and father "blame[d] it on [her], but if they had just let [her] get through the phase on [her] own or if [the defendant] had not molested [her] then [she] would be normal."

Another journal excerpt from April 26, 2011, read:

> So today when I was in the car with Jenny [White] she asked me how things are at home. A voice in the back of my head just started to shout that I needed to tell her everything. I was pretty calm about it, that comes with having told the story ten times I guess. After I finished telling her everything; she pulled up to the youth group parking lot and told me that she was legally obligated to call DCS.
>
> She asked to talk to Pastor Todd about it first and find out what's going to happen. She will talk to me before she does anything because I have questions and requests. I don't know whenever someone says abuse, I always think broken bones and rape, not this stuff. I wouldn't have told her, but I don't want [my sister] to go through the same stuff.
>
> I can deal [with] two more years of it, but I don't want her to experience it. She will hate me for taking mom and dad away, but I hope when she's older that she will forgive me.
>
> Mom always said that my first concern should be to protect the family. I tried to keep us together. I have lied to government officials and I hid secrets for four years.

At trial, the victim claimed that the events of which she told Ms. White did not occur.

The victim testified that after her allegations came out, she was placed in the home of an acquaintance from church. She also saw a sex therapist, Shana Frank, at the Nashville Children's Alliance for about a year. During the course of her therapy, the victim never told Ms. Frank that the abuse did not happen. The victim talked to Ms. Frank about the fact that her mother continued to allow the defendant to have contact with her after learning that he was sexually molesting her in the eighth grade. She said that her mother had "good intentions for everything" that happened after the incident between the victim and her boyfriend, explaining that her mother

6

said the defendant "was blowing off steam" during the time he beat her and kept her in her room. However, the victim told Ms. Frank that she wanted to resume a relationship with her mother. The victim stated that she felt extremely guilty about her parents being in court and acknowledged that both of her parents had told her that the problems in their family were her fault.

The victim testified that shortly after she turned eighteen, she returned to live with her mother. The victim admitted that she met with the prosecutor and said that she was concerned about her mother, but she knew that her father had to have some accountability for what he did.

The victim acknowledged having previously told a forensic examiner and testifying at juvenile court on two occasions that the defendant had committed sexual acts on her, starting at the age of twelve or thirteen. Among those actions, the victim had said that the defendant got in the shower with her about every other day "to conserve water and to rebuild the tender bond that [they] had from when [she] w[as] a young child." She acknowledged previously stating that when the defendant got in the shower with her, he would grab her breasts, "feel her up," and have erections. She acknowledged stating that the defendant would hug her and that she would feel his erection against her. She said that on one occasion, the defendant had pre-ejaculate on his penis, which he said never happened with the victim's mother. She acknowledged previously stating that, after the showers, she would take "naked naps" with the defendant. She said that they would "spoon" during those naps, which the defendant called "making love notes by intertwining [their] legs together" and that he would usually fall asleep with his hand on her breast. However, the victim denied that any of those statements were true.

The victim further acknowledged having previously stated, but now said that it was untrue, that the defendant often got erections during their naps together. She also admitted previously stating, but that it was untrue, that, during one naked nap, the defendant woke up with an erection, got on top of her, touched her private area to see "if it was wet and said ... you're horny too." She had also said that during that same incident, the defendant moved his hand around and made grunting noises, for which he apologized, but that was also untrue. Another statement the victim admitted previously making but now said was untrue was that on a couple of occasions, the defendant filled the bathtub with water and had her lay on top of him, after which he started thrusting or "humping" his penis against her body.

The victim testified that it was true that the defendant checked her hymen on one occasion during her eighth grade year when she was being homeschooled. She elaborated that she had to have a kidney removed when she was three years old, and she and the defendant were concerned that the surgery had taken her virginity. She explained:

> One of the surgeries they couldn't [get] all of the surgical tools up my vagina so they had to make a little incision in my hymen to fit everything in there. And that's always been something that's kind of been a concern. I never knew it happened until dad mentioned it one day.

7

> And so I was always really worried about it because virginity is a really big deal in our house. And so we looked. We decided to figure out what was going on because I can't see with a mirror. I didn't know what I was looking for.

The victim stated that she lay on the bed, held "everything open," and the defendant "checked real quick." The defendant determined that "it was still intact." The defendant told her that "[t]here was just like a little V cut [out] of it or something, and that it would hurt whenever I lost my virginity." The victim recalled that the incident was "really awkward and uncomfortable." The defendant also later told her that she "had a lot of vagina" and asked whether she was a hermaphrodite. The victim denied that the defendant touched her vagina and moved his hand around until she told him that it was uncomfortable. She explained that, instead, she spread her genitals apart for the defendant to look. The victim admitted that the defendant told her not to tell her mother or other people about his playfully grabbing her breasts or checking her hymen because people would think it was sexual abuse. The victim acknowledged that the defendant's action of checking her hymen was inappropriate and "really weird," but she claimed "there was nothing sexual about it."

The victim admitted that the defendant discussed his and her mother's sex life and told her about her mother's fetishes. The defendant told the victim that she "stressed him out," which caused his blood pressure to rise such that he had to be on medication. According to the victim, one of the defendant's medications caused him to easily get erections. However, the victim stated that the defendant told her that his erections with her caused him to have problems getting erections with her mother. She acknowledged that the defendant said that he did not have sex with his wife because of her. The victim elaborated:

> [W]hat I know is that I was stressing dad out and he had blood pressure problems. And he got on Cialis and he was still having problems having sex with mom. But when he was around the house just hanging out and I was at the house, it would happen.

The victim denied ever seeing the defendant with an erection despite having previously said that she had.

The victim testified that the defendant came to school to have lunch with her once or twice a week and people started spreading rumors about them. One rumor was that she "was making out with [her] dad on the back of a motorcycle." Thereafter, the defendant stopping visiting her for lunch so often.

The victim acknowledged telling prosecutors on the morning of the trial that the defendant had touched her inappropriately. She discussed with the prosecutors how the defendant had showered with her and touched her breasts and buttocks in the shower. She also discussed that the defendant got erections. She referred to the defendant's having pre-ejaculate on his penis and stated that she had asked him about it. The defendant told her that he did not know what it was because he had never experienced it with the victim's mother. The victim told prosecutors that the defendant masturbated in the shower when she was in the room. One time, the

defendant filled the bathtub with water and made the victim lie on top of him while he had an erection. The victim discussed taking "naked naps" with the defendant and his touching her breasts and buttocks. She explained that the defendant "spooned" her in bed, that his penis came in contact with her, and that he sometimes got erections. The victim discussed with the prosecutor a particularly upsetting incident when she woke up and the defendant had an erection. She elaborated that "things got out of hand," and the defendant got on top of her and "started feeling [her] up." He asked her "if [she] was wet," and she rolled out from underneath him, told him to stop, and left the room. She told the prosecutors that she and the defendant later talked about it, and he apologized.

The victim acknowledged that, during her conversation with the prosecutor right before the trial, she asked the prosecutor how long of a sentence the defendant faced. Asked why she did not recant then, the victim responded, "Because everybody has an agenda. And . . . I'm just . . . tired of having a bunch of attorneys tell me what to do[.]" She stated that she did not want the guilt of having her father "go to jail when he didn't do most of the stuff." However, she stated that "[t]here is some stuff he did do that was really wrong, but I'm not going to keep making lies." She acknowledged that the prosecutor did not ask her to embellish the truth.

The victim testified that, even though she told several people about numerous allegations of molestation, even as recently as the morning of trial, the stories were all fabricated. The victim admitted that, in sum, she had told the guidance counsel at NSA, a DCS worker, a forensic interviewer, and an attorney from the district attorney's office that the defendant molested her. She explained that her testimony was different now because she was an adult and understood that there were consequences for lying under oath. The victim admitted that she was having trouble testifying, explaining, "Like I'm trying to split out which parts actually happened and which parts didn't."

Robert Wilson, former principal of NSA, testified that the victim began attending the school in the ninth grade. Prior to attending NSA, the victim attended Two Rivers Middle School, but there was a one-year gap between her attendance at the two schools and nothing in her record to indicate that she was being homeschooled that year. However, the victim passed the tests to be admitted to NSA.

Mr. Wilson testified that sometime during the 2009–2010 school year, he observed some behavior between the victim and the defendant that concerned him. On one occasion, he observed the defendant and the victim leaning against a door together and walking hand-in-hand to the cafeteria. Mr. Wilson followed them and saw them sit in two chairs at the far end of the cafeteria. The victim had her bare feet in the defendant's lap, and he was playing with her toes. Mr. Wilson noted that he had never seen a parent and child interact in such a manner. Mr. Wilson also noted that the defendant was wearing a tank top, which was not proper school attire for students. Therefore, he spoke with the defendant and asked him not to wear tank tops to the school.

Mr. Wilson testified that the defendant called and left him a message stating that he was concerned about what some students were saying about his relationship with

the victim. The defendant asked if Mr. Wilson could provide a private place where he and the victim could have lunch together. Mr. Wilson returned the defendant's call and told him that he could not provide a private lunch spot and that if he was concerned about the rumors, "he probably shouldn't come around so much." Within weeks of that conversation, Mr. Wilson observed the defendant and the victim having lunch in the teacher's lounge. He informed them that they did not have permission to be in the teacher's lounge and that they needed to leave. Mr. Wilson stated that, as an educator, he had mandatory reporting obligations regarding suspected child abuse, and he made a referral regarding the victim in April 2011. Mr. Wilson acknowledged that he never saw any acts of molestation or sexual abuse of the victim by the defendant.

Jenny White testified that, in the spring of 2011, she was a youth pastor at Friendship Community Church. The victim's family attended church there, and the victim and her sister attended the mid-week youth group meetings. At some point, Ms. White began giving the victim a ride to church because they lived in the same neighborhood.

Prior to April 2011, the victim shared with Ms. White some "questionable" things about her family that caused Ms. White to inform the victim that she might have to disclose that information to others if the victim continued to share information. This included the defendant's having seen the victim in the shower. Additionally, Ms. White had observed "a lot of physical touching between a father and daughter, a lot. Back rubs, a lot of hugging, kissing on the mouth, that sort of thing that is strange just enough that it would put up a red flag[.]" Then, in April 2011, the victim disclosed to her some information, and Ms. White told her that she would have to disclose that information if they kept talking. The victim was okay with Ms. White disclosing the information and continued to talk to her. Ms. White got the impression from the victim that she did not want to be in the home and "didn't want her sister there either for protection purposes[.]" With the victim's permission, Ms. White called the victim's school and spoke to the principal and guidance counselor. The three of them decided that they needed to make a referral to DCS.

After the referral, Ms. White continued to pick up the victim for youth group meetings. Ms. White assisted law enforcement and DCS in facilitating a meeting with the victim before they spoke to her family. Ms. White picked up the victim for youth group, and officers and DCS spoke to her at church. During that meeting, the victim made a phone call to the defendant. Thereafter, officers asked Ms. White to drive the victim home but had an officer meet them at the house. Ms. White recalled that the victim "was super nervous and was crying." The victim went to stay with another family in the neighborhood. Ms. White continued to take the victim to youth group until the victim eventually began going to another church. The victim never recanted her story to Ms. White.

The victim's former boyfriend testified that he was a graduate of NSA and had dated the victim from his sophomore to his senior year. He described that their relationship "started out a little iffy and then [they] got to become better friends and then towards the end it got a little untrusted[.]" With the exception of the times at the beginning and the end of their relationship, he and the victim were close, "[b]est

friends pretty much. We would talk about anything."

The victim's former boyfriend said that, during their sophomore year, he and the victim got into trouble at school and were suspended. At the time of their suspension, he and the victim were very close. They communicated with each other through Facebook messages during the suspension. The victim told him that the defendant had beaten her. He could tell that the victim appeared to be sad and upset. He was out of school for three days, and the victim returned to school the following week. The victim told him that she wanted to return to school to get away from the house for a while. Just prior to the victim's returning to school, he and his parents had dinner with the victim and her parents.

Prior to the suspension, the victim had indicated to her boyfriend that the defendant had sexually abused her. He was aware that the victim kept journals. A couple of weeks prior to the suspension, the victim asked him to keep one of her journals. Around the time of the suspension, the victim asked him to keep a second journal. He later gave the journals to the police.

Officer Edmond Strickling with the Metro Nashville Police Department's Sex Crimes Unit testified that, in April 2011, he received a referral from DCS and began investigating the alleged sexual abuse of the victim by the defendant. Officer Strickling met with the victim at a church and conducted a detailed interview with her. During the interview, the victim made a controlled phone call to the defendant which was recorded.

During the call, the victim referred to a Bible verse and asked the defendant if they were going to go to hell because they were "sinful people from the stuff [they] did." She stated, "Because I mean we saw each other naked just like it says in the verse[.]" The defendant responded, "I changed your diapers. I saw you naked when you were two. True, things changed, furniture moved, things developed, and it's true that, uh, we did take some liberties that might have been questionable." The defendant then noted that privacy in their household had never been "all that great." The defendant looked up the Bible verse to which the victim had referred and stated that it was talking about brothers and sisters committing incest. The victim asked about taking showers together and "naked naps." The defendant then questioned whether the victim was alone, and she responded affirmatively. The defendant answered, "[W]e didn't have sex.... I didn't do anything with the intent of sexual gratification." The victim again asked whether they would go to hell because of the naked naps and the showers, and the defendant stated that he had asked for her forgiveness and "[i]f there was a sin there, it was [his] not [hers]." He then said that he had repented and asked for God's forgiveness, and again that he had asked for her forgiveness "for the times it may have gone a bit far."

The defendant stated that "there were a lot of reasons that seemed to make sense . . . at the time . . . when it was done." He continued, "I backed away from you ... as you began to develop because I didn't know what to do with it. . . . And I was a little bit panicked about it." He then told the victim, "[Y]ou were starting to throw off pheromones that were making my body respond in ways that were extremely embarrassing to me." He stated that he went to a therapist but stopped going

because the therapist suggested that his actions were sexual abuse. He noted that "from a certain point of view, [the therapist] may have had a point." The defendant stated that, as the victim got older, he needed to reestablish the bond that he had with her as a child. He stated, "I felt the strongest bond to you as a child was when I'd lay on the couch and lay you on my chest and you'd sleep on my chest. . . . That was skin to skin." The defendant claimed that the "naked naps" were to try to bond with the victim again. The defendant said that he was "trying so hard to control what was happening down there" when he was around the victim that he was experiencing trouble having sex with his wife.

The victim referred to the defendant's touching her, and he responded, "I guess, I did." He elaborated, "I examined your hymen twice because I was trying to learn about it and trying to figure out what to do about yours. Um, but I never touched your clitoris. I never tried to arouse you. Did I?" The victim responded that he did, and the defendant apologized. The victim told the defendant, "There was one time when you woke up from the nap, and you had [an erection] and you – it got scary, and that's when I jumped out of the bed, and you came out ten minutes later and apologized." The defendant said he remembered that incident and "that was what [he] was asking for forgiveness for. That was . . . off the charts, and that was wrong." He explained that he was waking up and "trying to deal with [her] pheromones, and [he] really didn't have a handle on it at the time, and . . . it went too far."

The defendant said that he thought he needed to educate the victim about sex. He noted that "privacy was already . . . lost in this house anyway" and he "always kind of had a slight nudist vent anyway," but "[t]he biggest problem was that [he] kept getting [erections] anytime [he] was around [her]." Toward the end of the conversation, the defendant stated that "there w[as] at least one occasion where it went entirely too far. Um, I did examine your hymen." He elaborated that he thought the doctor who performed surgery on her when she was toddler had "took her virginity."

After the call, Officer Strickling went to the defendant's home and confronted him about the allegations of sexual abuse. Officer Strickling audio-recorded his conversation with the defendant. The defendant denied the allegations of sexual abuse. Officer Strickling later spoke to Dominick Carson and his parents. Mr. Carson provided Officer Strickling with the victim's journals that he had in his possession.

The defendant did not testify or present any evidence.

(Doc. No. 13-15 at 2–13.)

### III.   ISSUES PRESENTED FOR REVIEW

The Petition asserts three claims for relief:

1.   There was insufficient admissible evidence to support his convictions. (Doc. No. 1 at 5.)

2. Trial counsel was ineffective in eleven different ways, and the cumulative effect of trial counsel's ineffective assistance resulted in denial of a fundamentally fair trial. (*Id.* at 9–10; Doc. No. 10 at 6.) And

3. Petitioner is actually innocent of the crimes of which he was convicted. (Doc. No. 1 at 14.)

## IV.     STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence" on the outcome of the case. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)).  AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).  Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state

court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings.'" *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support

14

in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 and n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181.

The demanding review of claims rejected on the merits in state court, however, is ordinarily only available to petitioners who "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). "To be properly exhausted, each claim must have been 'fairly presented' to the state courts," meaning that the petitioner presented "the same claim under the same theory . . . to the state courts." *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted).

The procedural default doctrine is "an important 'corollary' to the exhaustion requirement," under which "a federal court may not review federal claims that . . . the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (citations omitted). A claim also may be "technically exhausted, yet procedurally defaulted," where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him." *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) (citing *Jones v. Bagley*, 696 F.3d 475, 483–84 (6th Cir. 2012)).

To obtain review of a procedurally defaulted claim, a petitioner must "establish 'cause' and 'prejudice,' or a 'manifest miscarriage of justice.'" *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1134 (6th Cir. 2016) (citing *Sutton v. Carpenter*, 745 F.3d 787, 790–91 (6th Cir. 2014)). Cause may be established by "show[ing] that some objective factor external to the defense"—a factor that "cannot be fairly attributed to" the petitioner—"impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 137 S. Ct. at 2065 (citations omitted). To establish prejudice, "a petitioner must show not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Garcia-Dorantes v. Warren*, 801 F.3d 584, 598 (6th Cir. 2015) (quoting *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991)) (internal quotation marks omitted). And the manifest-miscarriage-of-justice exception applies "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

16

# V. ANALYSIS AND DISCUSSION

## A. Claim 1 — Sufficiency of the Evidence

Petitioner asserts that there was insufficient evidence to support his convictions in light of the fact that his daughter recanted her previous reports at trial. He raised this claim on direct appeal, and the Tennessee Court of Criminal Appeals rejected it in a thorough analysis:

> The defendant contends that the evidence is insufficient to support his convictions. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190–92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).
>
> A criminal offense may be established entirely by circumstantial evidence. *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. *State v. James*, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 380–81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).
>
> All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:
>
> > This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury

are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The State elected the following facts for the six counts of sexual battery by an authority figure and the one count of rape:

> Count 1—The defendant touched the victim's breast in the shower.
>
> Count 2—The defendant touched the victim's body with his erect penis while hugging her in the shower.
>
> Count 3—The defendant touched the victim's body with his erect penis while the victim was lying on top of him in the bathtub.
>
> Count 4—The defendant touched the victim's breast while they were lying naked in the bed.
>
> Count 5—The defendant touched the victim's naked body with his erect penis when he got on top of her in the bed.
>
> Count 6—The defendant touched the victim's genitals to see if she was "wet" while they were lying naked in the bed.
>
> Count 7—The defendant penetrated the victim's genitals with his hand when he "checked her hymen."

Sexual battery by an authority figure is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim [when] ... [t]he victim was, at the time of the offense, thirteen (13) years of age or older but less than eighteen (18) years of age ... [and] [t]he defendant had, at the time of the offense, parental . . . authority over the victim and used the authority to accomplish the sexual act." Tenn. Code Ann. § 39-13-527(a)(1), (3)(B). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id.* § 39–13–501(6). Rape is defined as "unlawful sexual penetration of a victim by the defendant or the defendant by a victim [when] . . . [f]orce or coercion is used to accomplish the act[.]" *Id.* § 39–13–503(a)(1). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, or any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39–13–501(7). Coercion can include the "use of parental, custodial, or official authority over a child less than fifteen (15) years of age[.]" *Id.* § 39–13–501(1).

18

The defendant contends that the evidence is insufficient to support his convictions because the victim recanted her previous allegations of sexual abuse at trial. He also argues that his checking the victim's hymen does not meet the definition of "unlawful" under the rape statute.

Although the victim recanted her prior allegations of sexual abuse at trial, she acknowledged that she had repeatedly and consistently stated prior to trial that the defendant had sexually abused her. Without objection, the State admitted the victim's testimony from two prior juvenile court hearings in which the victim detailed the sexual abuse by the defendant. During those hearings, the victim testified that she and the defendant showered together and that the defendant grabbed her breasts and often had erections in the shower. The victim stated that, after the showers, she and the defendant took "naked naps" together, and the defendant fell asleep "spooning" the victim with their legs intertwined and his hand on her breast. She said that the defendant often got erections during their naps together. On one occasion, while taking a naked nap, the defendant woke up with an erection, got on top of her, touched her private area to see if she was aroused, and noted that she was "horny" also. On another occasion, the defendant filled the bathtub with water and had the victim lie on top of him, after which he started thrusting his erect penis against her body. On at least one occasion, the defendant penetrated the victim's vagina while examining her hymen to check her virginity.

At trial, even though she denied that many of her prior allegations of sexual abuse had occurred, the victim acknowledged that the defendant checked her hymen when she was thirteen years old. She explained that the defendant was concerned that she was no longer a virgin because of a surgery she had when she was three years old. She admitted that the defendant grabbed and squeezed her breasts and smacked her buttocks. The defendant also discussed masturbation with her and offered to buy her a vibrator.

In addition, following the victim's disclosure of abuse, she made a recorded phone call to the defendant, during which the defendant admitted to inappropriate behavior with the victim. During the call, the defendant acknowledged seeing the victim naked and "tak[ing] some liberties that might have been questionable." The victim asked the defendant about their taking showers and "naked naps" together. The defendant noted that they did not have sex and that he had asked for her forgiveness. The defendant told the victim that "as [she] began to develop," she "start[ed] to throw off pheromones that were making [his] body respond in ways that were extremely embarrassing to [him]." He stated that he went to a therapist but stopped going because the therapist suggested that his actions were sexual abuse and that, "from a certain point of view, [the therapist] may have had a point." The defendant acknowledged having taken naked naps with the victim and explained that he did so in an effort to bond with her again. The defendant said that he was "trying so hard to control what was happening down there" when he was around the victim that he was experiencing trouble having sex with his wife.

The defendant admitted touching the victim in that he examined her hymen twice. However, he claimed that he never touched her clitoris or tried to arouse her, at

which point the victim responded that he did and the defendant apologized. The victim told the defendant, "There was one time when you woke up from the nap, and you had [an erection] and you—it got scary, and that's when I jumped out of the bed, and you came out ten minutes later and apologized." The defendant said that he remembered the incident and "that was what [he] was asking for forgiveness for. That was . . . off the charts, and that was wrong." He explained that he was waking up and "trying to deal with [her] pheromones, and [he] really didn't have a handle on it at the time, and . . . it went too far." The defendant admitted getting erections when he was around the victim.

Furthermore, the victim's church youth leader and school principal testified regarding questionable behavior by the defendant. Jenny White, the victim's church youth leader, testified that the victim previously told her that the defendant had seen her in the shower, and she had observed "a lot of physical touching between a father and daughter, a lot. Back rubs, a lot of hugging, kissing on the mouth, that sort of thing that is strange just enough that it would put up a red flag[.]"

Robert Wilson, the victim's school principal, testified that the defendant visited the school often. He recalled an instance when he observed the defendant and the victim leaning against a door together and walking hand-in-hand to the cafeteria. He followed them and saw them sit in two chairs at the far end of the cafeteria. The victim had her bare feet in the defendant's lap, and the defendant was playing with her toes. Mr. Wilson noted that he had never seen a parent and child interact in such a manner. He recalled that the defendant asked him for a place where he and the victim could have lunch in private because he was concerned about what some students were saying about his relationship with the victim. Mr. Wilson told the defendant that he could not provide a private lunch spot but, within weeks of that conversation, Mr. Wilson observed the defendant and the victim having lunch together in the teacher's lounge without permission.

As was its prerogative, the jury chose not to accredit the victim's testimony at trial in which she testified that her previous allegations were not true. The jury heard testimony that at the time of trial, the victim was living with her mother, her parents were still together, and the victim occasionally saw the defendant. The victim admitted that the guilt of having her parents in court was difficult for her and that her parents had told her that the problems in their family were her fault. In the light most favorable to the State, the evidence is sufficient for a rational trier of fact to find that the defendant committed the acts of sexual abuse against the victim for the purpose of sexual arousal or gratification and that the defendant used his parental authority to commit the act of rape against the victim by telling her that he was concerned that she had lost her virginity during a surgery when she was young and needed to examine her hymen.

(Doc. No. 13-15 at 14–18.)

The right to due process guaranteed by the Constitution ensures that no person will suffer a criminal conviction without sufficient proof. The evidence is sufficient if "after viewing the

20

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319. The state court accurately identified this standard, and analyzed the evidence presented at trial in light of it. It also correctly applied the rule that a reviewing court must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *United States v. Conatser*, 514 F.3d 508, 518–19 (6th Cir. 2008) (quoting *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001)).

Habeas review adds yet another layer of deference to the sufficiency analysis. In reviewing such an analysis by a state court in a federal habeas action, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011). Witness credibility assessments are "predominately the business of trial courts," and "federal habeas courts do not have license, under § 2254(d), to redetermine witness credibility, whose demeanor is observed exclusively by the state court." *Givens v. Yukins*, 238 F.3d 420 (6th Cir. 2000) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

Petitioner's argument in support of his claim to this Court consists of three main points. First, he insists that the victim's recantation at trial of her previous reports effectively foreclosed his conviction and made her "unimpeachable." (Doc. No. 1 at 5.) Second, he maintains that the forensic interview of the victim should not have been admitted or considered to support his conviction because it was unreliable. (*Id.* at 6.) And third, he argues that the recorded phone call between him and the victim confirms "events [that] are embarrassing, and in hind sight improper, none of them contain the required elements of 'penetration' or of 'sexual contact that can be

reasonably construed for the purpose of sexual gratification'" required to support his convictions. (*Id.* at 6–7.)

Petitioner's presumption that the victim's recantation on the witness stand automatically immunized him from conviction is simply incorrect. He argues that the victim had a clear motive to fabricate her earlier reports—presumably her desire to stay out of the home and be able to visit with her boyfriend—but she had an equally clear motive to falsely recant those reports—the pressure from her parents' blaming her for the family's troubles and her feelings of guilt. It was the prerogative of the jury, who observed the victim's demeanor during trial, to weigh those possible motives and determine which version of the victim's story was the truth.

Petitioner suggests that the version of the story relayed through the victim's forensic interview should not even have been an option for the jury to believe because it was inadmissible. But that point is not germane to the question of whether the admitted evidence was sufficient to support his convictions: "[i]n assessing the sufficiency of the evidence the Court is required to weigh all of the evidence, even that evidence which was improperly admitted." *Smith v. Rivard*, No. 16-CV-10208, 2017 WL 2189444, at *3 (E.D. Mich. May 18, 2017) (citing *Lockhart v. Nelson*, 488 U.S. 33, 38-39 (1988)). Moreover, Petitioner waived any claim about the admissibility of the interview in state court (*see* Doc. No. 13-15 at 18–20) , and when he asserted on direct appeal that the evidence was insufficient to support his conviction, he did not raise the alleged inadmissibility of any evidence as part of that claim. (*See* Doc. No. 13-12 at 14–17.) To the extent Petitioner's current claim is not "the same claim under the same theory" that he exhausted in state court, that portion of his claim is defaulted and not subject to federal review. *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted). And finally, even if Petitioner could nevertheless dispute the interview's admissibility in the context of his current

claim, the trial court determined that the interview was admissible under Tennessee evidentiary rules because it was recorded, occurred close in time to the alleged events, and was generally consistent with the victim's reports over a three-year period. (*See* Doc. No. 13-15 at 19.) The victim testified at trial and was subject to cross-examination about the statements she made during the interview. Petitioner's personal conclusion that the interview was untrustworthy cannot overcome the state court's determination that it was.

In the recorded phone call that Petitioner describes as simply embarrassing, he acknowledged having "take[n] some liberties that might've been questionable" and having asked the victim's forgiveness "for the times that it may have gone a bit far." (Doc. No 13-7 at 25, 29.) He did not dispute taking showers and "naked naps" with the victim. (*Id.* at 26–27.) He said "I examined your hymen twice." (*Id.* at 34.) In response to the victim's mentioning a particular instance when he "woke up with a boner" and things got "scary," he said "I do remember that. . . That was off the charts and that was wrong." (*Id.* at 34–35.) He asserted that he never touched the victim's clitoris and never did anything for the purpose of sexual gratification, but he repeatedly blamed the victim's "pheromones" for his behavior and said things "went too far" because he "really didn't have a handle on it at the time." (*Id.* at 35.) He said the victim "consumed [his] brain at that point" and that "the biggest problem was that [he] kept getting hard-ons any time [he] was around [her]." (*Id.* at 37, 40.) He said the victim was "throw[ing] off pheromones that were making [his] body respond in ways that were extremely embarrassing," and that he "was trying so hard to control what was happening down there" around the victim that it ruined his sexual relationship with his wife for six months. (*Id.* at 30, 33, 40.) He said that a therapist with whom he discussed the situation began drawing conclusions that implicated sexual abuse and that "from a certain point of view, she may have had a point." (*Id.* at 31.)

Petitioner's admissions during that phone call thoroughly disprove any argument that his "embarrassing" behavior with his daughter was not sexual in nature. They also confirm Petitioner's "examination" of the interior of his daughter's vagina, which, according to the victim's statement during her forensic interview, involved his "having to move stuff to see where the hymen was" and doing something that "hurt for a second." (Doc. No. 14, Trial Exhibit 2 video at approx.. 10:27:22.) And those acknowledgments during the phone call appear even more incriminating in light of the fact that, shortly after the call, Petitioner denied to Officer Strickling that he had ever intentionally seen his daughter nude since she was a baby. (*See* Doc. No. 13-7 at 65–66.) This evidence, combined with the rest of the trial evidence summarized above, was constitutionally sufficient to support Petitioner's convictions for sexual battery and rape, just as the state court concluded.

Ultimately, Petitioner disagrees with the state court's decision, but he has not carried his burden of establishing that the decision *unreasonable*. The state court's deference to the jury's determination, which was supported by the evidence referenced above by the Tennessee Court of Criminal Appeals, was not unreasonable. Particularly in light of the "double layer of deference" this Court must extend on this claim—first to the jury's finding of guilt and then to the state appellate court's finding of sufficient evidence, *White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009)—Petitioner is not entitled to relief on this claim.

## B. Claim 2 — Ineffective Assistance

Petitioner alleges in Claim 2 that trial counsel was ineffective for the following reasons:

1. Failing to object to the admissibility of evidence;

2. Failing to object to improper impeachment of the victim;

3. Failing to examine evidence;

4. Failing to call witnesses;

5. Failing to object to improper questioning;

6. Failing to investigate surgeon's notes from the victim's surgery;

7. Failing to prepare and research applicable law;

8. Failing to file pre-trial motions;

9. Failing to move for a bill of particulars; and

10. Failing to communicate with Petitioner.

(Doc. No. 1 at 9–10.) Petitioner's Motion to Amend, which the Court has treated as a supplemental memorandum in support of his Petition, re-states these sub-claims and adds the allegation that counsel was ineffective for losing or failing to utilize evidence provided by Petitioner. (Doc. No. 10 at 6.) The Court will consider this latter assertion as Claim 2.11.

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688, 689. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

> The Supreme Court has further explained the *Strickland* prejudice requirement as follows:
>
> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

*Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (internal citations omitted). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

As discussed above, however, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562

U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted).

1. Exhausted Claims

Petitioner exhausted several of his ineffective-assistance claims in state post-conviction proceedings. Specifically, Petitioner exhausted claims in post-conviction that trial counsel (1) failed to make proper objections to the admission of the victim's forensic interview, (2) failed to object to the admission of the victim's testimony from previous juvenile court hearings, (3) failed to examine the victim's journals prior to trial and properly rebut them, (4) failed to consult with Petitioner about whether he should testify at trial. (Doc. No. 13-21 at 20–28.)

The Tennessee Court of Criminal Appeals accurately identified and explained the *Strickland* standard for federal ineffective-assistance claims. (Doc. No. 13-24 at 27–28.) It summarized the relevant post-conviction hearing testimony as follows:

> At the post-conviction hearing, lead counsel stated a jury consultant referred the petitioner's case to him and he accepted the same. At the time, lead counsel practiced in New York but met with the petitioner prior to trial both in person and over the phone. Lead counsel acknowledged the original trial date was changed and as a result, the jury consultant hired by the petitioner was no longer available to attend trial.
>
> Lead counsel asserted he "fully discussed the case with [the petitioner]." Though he could not remember how many trips he made to Tennessee, lead counsel appeared in court for the petitioner and reviewed discovery with the petitioner prior to trial. Lead counsel and the petitioner discussed "all of the circumstances of the case," and lead counsel "got full explanations of everything." He "spoke to [the petitioner] in the presence of [the petitioner's] wife, and [lead counsel] went over

27

the case in detail." He answered the petitioner's questions and believed the petitioner understood the issues and evidence in the case. Lead counsel also discussed a plea bargain with the petitioner and stated, "I would never try a case where the [petitioner] wasn't completely involved in it."

Lead counsel then addressed specific issues that emerged during trial after the victim recanted her allegations of abuse. Before trial began, lead counsel was aware the victim "made prior statements," and he discussed the same with the petitioner and local counsel. He "remember[ed] discussing specifically the fact that [the victim] . . . was going to deny that [the petitioner] did anything." He explained his resulting trial strategy, as follows:

> I put forth in front of the jury the fact that there were circumstances that lead (sic) [the victim] to say the things that she said. And obviously that argument didn't work, but I believe that there was a motive on the [victim's] part at that time to say those things. And there were circumstances that I was able to argue to the jury.

Lead counsel considered the victim's prior statements to be recent fabrications rather than inconsistent statements, and he deferred to the record regarding his cross-examination of the victim about the same. Additionally, lead counsel explained he "let . . . local counsel object on all of the issues in the case," which included objecting to the victim's prior statements.

Regarding the victim's journals, lead counsel believed he "had" them prior to trial but he was not sure. He remembered local counsel objecting to the admissibility of the victim's journals, noting "You know, I think [local counsel] objected to it. And I went along with it, but the judge ruled the other way. And I personally I -- on reflection, I can see why he did." Regarding the admission of the victim's forensic interview at trial, lead counsel again stated he "didn't do the objection." After discussing the issue with local counsel, however, they agreed on a strategy wherein "it was better for the [victim] to come in and deny that it happened. And I think there were many motives that were brought out before the jury why she did that." Lead counsel did not recall the evidentiary issues surrounding the admissibility of the victim's testimony from a juvenile neglect hearing.

During cross-examination, lead counsel stated he appeared on behalf of the petitioner at least once prior to trial though he did not remember if he attended a May 3, 2013 hearing on a motion to continue the petitioner's trial, and he did not remember sending a letter about a conflict in his schedule regarding the same. Lead counsel confirmed he cross-examined all witnesses during trial but deferred to local counsel regarding all evidentiary objections though he did "look[ ] over the Tennessee rules" prior to trial. Lead counsel did not remember when the forensic interview or juvenile neglect hearings occurred. He did not recall objecting to the entry of the victim's journals or going to the property room to review them before trial but acknowledged the record reflected that he had not reviewed all of the journal entries prior to trial. Lead counsel did not remember the dates of the journal entries, the substance of the journal entries read into the record at trial, and only "[v]aguely remember[ed]" the victim's boyfriend had possession of the journals

before turning them over to the State. He again stated local counsel handled the objections concerning the entry of the journal entries as substantive evidence at trial.

Lead counsel classified the particular facts of the case, wherein the victim recanted the accusations against the petitioner, "as a little rare" and also acknowledged it was "unusual" for the State to use prior inconsistent statements to impeach the victim during trial. Lead counsel did not file any pre-trial motions to exclude the victim's prior statements, and he did not recall whether he considered filing a pre-trial motion to exclude the journal entries.

Local counsel testified he was retained by the petitioner prior to trial. However, after he urged the petitioner to take a plea deal, the petitioner hired lead counsel who took over the case. Prior to lead counsel's hiring, local counsel represented the petitioner during "a full depend[e]nt/neglect trial." As such, local counsel "was well aware of all of the facts and had pretty much prepared the trial except for the last minute stuff you do before [lead counsel] came in."

Local and lead counsel maintained a "cordial" relationship as they prepared for trial. The two "had telephone conferences" and had "an in-depth conversation" wherein they discussed "the evidence, the problems in this case, what the theory would be," and "whether or not the victim was going to testify." Prior to trial, local counsel "didn't have a real clear certainty in my mind at that point whether [the victim] was going to deny or not" whereas lead counsel "felt [the victim] was going to deny" her allegations during her testimony.

During trial, local counsel handled all objections, but pre-trial motions and strategy ultimately fell to lead counsel. Local counsel stated no pre-trial motions were filed to challenge the State's evidence, including the victim's journals, the victim's forensic interview, the victim's testimony from the neglect hearing, Mr. Wilson's testimony, or Ms. White's testimony. He did not recall the testimony of Mr. Wilson or Ms. White or his objection, or lack thereof, to the same during trial. Local counsel admitted he did not object to the introduction of the victim's testimony from the neglect hearing into evidence.

Regarding the victim's journals and counsel's review of the same, local counsel stated he had "at least what [he] believed was probably the most damaging portions" of the journal entries prior to trial. He disagreed with lead counsel's testimony on this issue, stating "I don't remember what we didn't get, if anything, before trial or by trial." However, local counsel also did not "have a memory of going down and looking at [the journals], so if I said I did not, then I did not." He acknowledged the record reflected that lead counsel made a motion during trial to exclude the victim's journals. Regarding the "crucial" nature of the victim's journals, local counsel stated "I can't give a simple yes or no answer to that because it depends on what -- how you are defining crucial. Could they have won the case without them, yes. . . . It did strengthen their case."

Local counsel filed a motion for new trial on behalf of the petitioner, a copy of which was entered into evidence. Within the motion, local counsel did not address lead counsel's motion to exclude the victim's journals as a discovery violation

during trial. In reviewing this Court's opinion on direct appeal as to local counsel's objection to the admissibility of the victim's forensic interview during trial, local counsel acknowledged this Court stated he should have objected to the introduction of the evidence as cumulative rather than as a violation of the confrontation clause. Local counsel, however, maintained his objection was "legitimate."

During cross-examination, local counsel stated he met with the petitioner numerous times, noting the petitioner "was one of those clients that was more active than most. He would call routinely, he would stop into the office. We had a lot of communication." Local counsel was comfortable with the petitioner's understanding of the case, but "was not comfortable with [the petitioner's] understanding of [how] damaging certain pieces of evidence were and we had in my view little to no chan[c]e to win." Despite local counsel's advice, the petitioner chose to go to trial.

Local counsel again clarified he "was barred as lead counsel well before the trial." As such, he did not prepare any pre-trial motions regarding the possible recantation of the victim because he was unsure if the victim would recant at all. Rather, when the victim recanted at trial, local counsel began considering how to combat the prior inconsistent statements and strategically chose to avoid repeating the victim's prior statements by not repeatedly objecting or requesting limiting instructions regarding the same. According to local counsel, "it just wasn't going to change the landscape. It was not going to change the fact that the jury heard these statements. It was just going to draw more attention to them."

However, local counsel did object to the introduction of the victim's forensic interview. When the trial court ruled against the objection, he and lead counsel decided the best course of action would be to play the entire interview, rather than only playing portions of it. Local counsel explained their strategy, as follows:

> Because we -- and I can't refer to the specific statements five years later because I haven't reviewed the entire case, I haven't reviewed the forensic interview. But I do have a clear memory of just talking over with [lead counsel] and making the clear decision in my mind that if the State was pulling out the damaging parts of the forensic interview. We felt that there were parts of the forensic interview that were -- if not outright helpful, just put somethings (sic) in more context. Because again, five years later and without having looked at the forensic interview, I don't recall if it was her demeanor and attitude that she had against her father or whether she made specific statements to -- that mitigated or made it -- I don't recall what it was. But I certainly felt that it was better for the defense to have -- if the bad parts of the interview were coming in, that the rest needed to come in because it -- I felt that was going to help us.

Local counsel did not recall any discussions about requesting limiting jury instructions as to the victim's forensic interview, her testimony from the neglect hearings, or her journals. He explained:

> And I think I probably in thinking about it, probably for half a

> minute thought about asking for a special instruction so that, you
> know, maybe if that would have not come in, we could have moved
> for a judgment of acquittal because if she recanted, and then there is
> no other evidence could we move for a judgment of acquittal.
>
> But you know, as has not been discussed here yet, when that
> controlled phone call was made with [the petitioner]. I mean, that
> was definitely coming in. And that was clearly enough for [the] State
> to overcome a judgment of acquittal, so I just didn't see any upside
> to either objecting or asking for special instructions.
>
> Now, would it have been maybe better or perfect practice for one of
> us, [lead counsel] or myself, to file some pretrial motions to try to
> whittle these other statements down, probably. But given the total
> landscape with all of the evidence, I don't think it would have made
> a difference in the verdict.

Local counsel did not dispute the motion to continue but also could not provide additional details surrounding the reason behind the same. He recalled having to "track down [lead counsel]" during the motion hearing and noted the case was ultimately continued. Finally, local counsel did not remember anything concerning the absence of a sexual evaluation in the presentence report of the petitioner.

During redirect examination, local counsel explained he had approximately "48 hours notice that [the victim] was probably going to recant. So I had that much time to think about it at least." Local counsel admitted he did not consider the prior inconsistent statements' inadmissibility under Tennessee Rules of Evidence Rule 613(b) as cumulative, extrinsic evidence after the victim admitted to making the prior statements during trial. Local counsel stated he did not

> have a specific memory of [the victim] testifying and saying, yes, I
> said this to this person or that to that person. I'm confident it
> happened just from my general recollection about the case, but I
> don't remember what she said as to each prior statement as far as
> admitting that she made that.

The petitioner then testified, stating he hired a jury consultant after local counsel expressed "he didn't believe he could convince a jury" and encouraged the petitioner to take a plea bargain. The petitioner then hired lead counsel on the recommendation of the jury consultant and the strength of lead counsel's online resume. Prior to lead counsel joining the defense team, the petitioner and local counsel went over the charges, but the petitioner stated they did not really discuss "the facts behind them." Though the petitioner no longer trusted local counsel prior to trial, he remained on the case with lead counsel. The petitioner met with lead counsel twice, "[t]he day that we were supposed to have a trial and didn't, and then the day when the trial actually happened." The petitioner explained on the original trial date, he flew family in from Texas and Colorado, flew the jury consultant in from California, and flew lead counsel in from New York. However, the case did not go to trial that date, but the petitioner was "not entirely sure" why. As a result, the jury consultant was not able to make the new trial date and the petitioner only

31

had his wife, lead counsel, and local counsel with him during the same.

Before trial began, the petitioner learned the victim might recant her allegations against him. According to the petitioner, the victim tried to approach him at church but he did not engage with her. Instead, the victim got lead counsel's telephone number from the petitioner's aunt and contacted lead counsel herself. The petitioner, however, did not know when lead counsel learned the victim would likely recant at trial, noting the issue "really wasn't discussed with [him]." The petitioner and lead counsel discussed the victim's potential recantation "[n]ot in specific terms, only in generalities of if this happened, if that happened, that is as far as that went."

The petitioner and lead counsel had "[n]umerous phone calls," and the petitioner provided lead counsel with "everything [he] had" in support of his defense. The two also discussed whether the petitioner should testify or not at trial. The petitioner stated lead counsel "said that [local counsel] recommended that I not [testify] and [lead counsel] was going to stick with what [local counsel] said, and he said no." The petitioner and lead counsel did not discuss anything further in regards to his decision, and the petitioner stated neither local nor lead counsel would discuss "what kind of questions to expect if he did" testify or provide "instructions on how to testify." The petitioner acknowledged his participation in a colloquy during trial wherein he stated it was his decision not to testify. The petitioner stated his trial testimony would have helped his case in that:

> I could have explained that phone call. There is a lot of back story behind that that nobody else really offered. I could have explained the relationship with my daughter and what was going on. I could have explained the moral position of me and my wife as far as my daughter's behavior. Everything that lead (sic) up to that, I could have -- I could have brought a lot to that.

Regarding the victim's journals, the petitioner understood the victim "admitted to having fabricating them and even explained how." To that end, the petitioner stated he found "a stack of blank notebooks and a box of different colored pens" in the victim's room which the petitioner believed to be the materials used by the victim to fabricate her journal entries. He gave local counsel the materials, but they were not presented at trial. Regarding the journals in the State's possession, the petitioner stated local counsel "had maybe four or five pages that were photocopied out, but beyond that" local counsel did not review the content of the journals further.

Finally, the petitioner stated appellate counsel told him he could not amend the motion for new trial because the notice of appeal had already been filed despite local counsel ensuring it could be amended. The petitioner stated local counsel "told me three times that issues that I wanted on that could be amended -- they could be added by the next guy was his quote." The petitioner listed the issues not presented in the motion for new trial, including "[t]he admission of the forensic interview, the journals. I'm trying to remember. There were four or five that I felt should have been added on and [local counsel] just similarly would not add them. He said the next guy would amend it is the word he used was amend." After filing the motion

for new trial, local counsel withdrew from the petitioner's case. Lead counsel withdrew prior to the filing of the motion for new trial.

During cross-examination, the petitioner stated he did not travel to New York to meet with lead counsel. Instead, they met when lead counsel traveled to Nashville. The petitioner did not consider the potential difficulty in meeting with an out-of-state attorney prior to trial but noted he talked to lead counsel on the telephone "[n]umerous times." The petitioner told lead counsel "[a]s much as [he] knew" about the charges against him despite not having "a list with details on it" as requested by lead counsel.

The petitioner further addressed the evidence produced against him at trial. He believed the substance of the juvenile court hearings were "general mostly" and, in his opinion, "lies." The petitioner acknowledged the recorded telephone call between him and the victim was discussed during the juvenile neglect hearings which addressed the victim's accusations that the petitioner touched her breasts and buttocks, took naked naps and showers with the victim, checked the victim's virginity by touching her vagina, and touched the victim's vagina while having an erection. As such, the petitioner admitted he was aware of the victim's specific allegations of abuse but stated he "knew it wasn't true." The petitioner sent lead counsel transcripts of the juvenile neglect hearings after which they had "lots" of discussions about the same, and the petitioner provided lead counsel with his version of the story. The petitioner was comfortable lead counsel understood his position regarding the allegations and the evidence in the case prior to trial. "More important to [the petitioner] was that [lead counsel] believed [him]." The petitioner stated he communicated with counsel during trial, heard the victim recant, and chose not to testify.

On the Friday before trial, the petitioner met with lead counsel at his hotel in Nashville. The petitioner began "to have some doubts" about lead counsel because "[h]e said he didn't remember a lot of stuff, . . . and eventually he chased me out of the room." The petitioner relayed his insecurities about lead counsel to his wife, not local counsel. The petitioner repeated, "I did not trust [local counsel] one bit by that time." The petitioner did not inform the trial court about his issues with counsel, explaining:

> Ma'am, I'm not a lawyer, I don't know what I could have done at that point. The trial was here, I had [local counsel] I didn't trust; I had [lead counsel] that I was beginning to have doubts about. What was I supposed to do? . . . They had already postponed this numerous times because I was trying to get counsel together. I really didn't expect them to say well, okay, let's go ahead and put this off another year.

The petitioner did not remember the terms of the plea offer but stated "I didn't want to plead guilty to something that I had not done."

During redirect examination, the petitioner stated lead counsel did not ask the petitioner to come to New York to discuss the case prior to trial and lead counsel did not review the juvenile neglect transcripts with him prior to trial. The petitioner

believed he provided counsel with all of the information he could about the evidence against him, but he did not know counsel failed to review the entirety of the victim's journals. Throughout the trial, the petitioner became concerned that lead counsel was suffering from "[m]emory loss." After learning lead counsel's father suffered from dementia, the petitioner "finally went awe, I see. He's having trouble with memory because it runs in his family. I'm not a doctor, so I can't back that up. That's just a connection that I made that kind of helped explain why he was as forgetful as he was." The petitioner stated he learned through his direct appeal that counsel made the incorrect objection regarding the admissibility of the forensic interview at trial.

Finally, at the request of the post-conviction court, the petitioner provided a description as to how he would have explained his actions with the victim had he testified at trial:

> [The post-conviction court]: And just so I can try to evaluate as the law requires me to, you raised about wishing you had testified but they didn't prepare you and didn't do anything, and I don't know exactly what the record says about all of that hearing at the time, but just so I can get a general understanding of how that decision not to testify might compare to what you would have told the jury. Because you said earlier that you would have testified and explained a phone call and what your daughter had said at juvenile, so my question is this: How would you have explained and knowing that you would have been cross-examined by the State about all of this? The phone call discusses your statement of, at times it went a bit too far, you talk about naked naps. You talk about every time you were around her, I'm using your words, hard-ons.
>
> ...
>
> And you couldn't help it. You checking her hymen multiple times and it had a little nick in it. And that her vagina, using your words again, was a little big, just generally -- and that's just a few of the things, what would you have told the jury about all of that?
>
> [The petitioner]: First of all, she made two very disturbing accusations.
>
> [The post-conviction court]: I'm talking about, these are your statements.
>
> [The petitioner]: Right. Right. Hold on.
>
> [The post-conviction court]: Okay.
>
> [The petitioner]: And having made those accusations didn't make any sense, they were confusing. I didn't understand what she was saying, so I recounted the three most embarrassing events and all of the three embarrassing events that could have possibly come to those kind of events and none of them contained it. And I have talk to her previously about these things. Nothing that I said to her wasn't what I had said before. And they were all fabricated to manipulate my daughter.

34

[The post-conviction court]: I'm not talking about any fabrication, I'm talking about your statements.

[The petitioner]: Yes, sir. Yes, sir. Parents -- parents –

[The post-conviction court]: You would have been asked by the State, what did you mean, [ ], when you said on the phone conversation that you went a little bit too far? And why did you, [ ], on the phone call say that you were checking her hymen to see if she was still a virgin?

[The petitioner]: I will tell you what, we will go with the hymen one.

[The post-conviction court]: Okay.

[The petitioner]: Okay. Parents sometimes lie to their children.

[The post-conviction court]: About Santa Clause, yeah, I get that.

[The petitioner]: I had had a very rebellious child. She did not respect my authority or my instruction. She was very flirty, she was -- she behaved in a promiscuous matter.

[The post-conviction court]: The jury over there is already looking kind of suspect on you.

[The petitioner]: Hold on.

[The post-conviction court]: Okay. Go ahead.

[The petitioner]: Anything that I could tell her that would give her that doubt, that moment of hesitation in which she can make a decision not to have sex would be in my opinion a good thing. Me and my wife, we have -- we hold to the purity values. I'm trying to think of a good way to say this that's not -- my wife and I were both virgins when we got married. It's important to us. [The victim] was not getting it. So anything that I could do to give her that hesitation, that moment of pause, anything that I could get her to stop behaving in a way that would make other teenage boys believe she was coming on to them, anything that I could do to prevent that.

[The post-conviction court]: And how does that have to do anything with checking her vagina?

[The petitioner]: Sir, I walked into the room for about three seconds, I looked, I said huh. I left the room, I told her it was thick and beefy and was really going to hurt the first time she had sex. It was really going to hurt a lot and it was going to bleed a lot.

[The post-conviction court]: So –

[The petitioner]: If I was going to try to do that, why would I –

[The post-conviction court]: You checked it.

[The petitioner]: I looked and then I walked out of the room. I was fully clothed I could --

[The post-conviction court]: And the naked naps and the I got an erection

every time; what is the jury going to think of that?

[The petitioner]: Well, there was only one. It was an accident, it was a mistake. I work third shift at UPS. I had to get sleep sometimes, I did take naps during the day. It was June, we had a hydration program. I drank a lot of water and I had a problem with erectile disfunction (sic) and I was took some medication that was given to me by a doctor. I didn't expect to wake up with one. It was embarrassing. I was ashamed. I had one.

[The post-conviction court]: So you would have had to acknowledge that you took naked naps with your daughter?

[The petitioner]: I took a nap -- I was, she wasn't. I was under the sheets, she wasn't. I did wake up with an erection. It was embarrassing. I didn't know what to do about it. She left the room, gave me some time to work out what to do about it.

[The post-conviction court]: But then they would ask you about on page three of the phone call what you meant by you agree you took liberties with your daughter that were questionable.

[The petitioner]: When she was cutting -- when I found that she had been cutting and I went into the bathroom and examined her after she got out of shower, that's the naked shower part. She was naked, I wasn't. I saw her.

[The post-conviction court]: So that's what you are talking about it was your sin, not her's (sic)?

[The petitioner]: Yeah, I was not comfortable with it. I didn't feel good about it. I was embarrassed about it. But yeah, I did it.

[The post-conviction court]: And you think that would have been a good thing to express from your perspective to [the] jury?

[The petitioner]: It would have been better than not I'm saying.

. . .

I almost wish you could have a Bible and I could put my hand up here and say I didn't do that.

After its review of the evidence presented, the post-conviction court denied the petition, finding the petitioner failed to carry his burden of proof to show the ineffective assistance of trial counsel. The petitioner timely appealed.

(Doc. No. 13-24 at 16–27.)

The court then rejected Petitioner's ineffective-assistance claims on the merits:

I. The Victim's Prior Statements

The petitioner argues trial counsel were deficient in their handling of the admissibility of the victim's prior statements, including her forensic interview and her testimony from the neglect hearing, at trial. Specifically, the petitioner asserts

36

trial counsel failed to properly object to the introduction of the victim's forensic interview and testimony from the neglect hearing as cumulative evidence under Tennessee Rule of Evidence 613(b).[1] The petitioner also asserts trial counsel erred in conceding the testimony from the neglect hearing was admissible as impeachment evidence. Finally, the petitioner argues trial counsel were deficient by failing to file pretrial motions to limit the introduction of the victim's prior statements. The State contends trial counsel's strategy concerning the victim's prior statements was "appropriate under the circumstances." Upon our review of the record, it is clear the petitioner cannot show prejudice resulting from trial counsel's handling of the victim's prior statements and he is not entitled to relief.

At the post-conviction hearing, both lead and local counsel testified they engaged in significant communication with the petitioner during which the petitioner provided explanations for his behavior as alleged by the victim. Additionally, trial counsel and the petitioner reviewed the victim's prior statements made in the forensic interview, the neglect hearings, and portions of her journals. After the discussions, trial counsel and the petitioner pursued a trial strategy wherein they would demonstrate the victim's motives in alleging abuse against the petitioner. Though lead counsel and the petitioner suspected the victim might recant her allegations of abuse during trial, local counsel was unsure of the same. As a result, local counsel did not address the victim's potential recantation until it occurred during trial. When the victim recanted and the State introduced the victim's forensic interview into evidence, local counsel objected to the introduction of it. The trial court, however, overruled the objection. The record shows local counsel then made a strategic decision not to draw unnecessary attention to any of the victim's prior statements wherein she accused the petitioner of sexual abuse. To that end, local counsel did not continue to object to or request jury instructions regarding the introduction of the prior statements. "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency." *Nesbit v. State*, 452 S.W.3d 779, 796 (Tenn. 2014) (citing *Goad*, 938 S.W.2d at 369). Accordingly, the petitioner has failed to demonstrate trial counsel's defense strategy was unreasonable, fell below professional norms, or that it prejudiced the outcome of his case. *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 687, 688; *Baxter*, 523 S.W.2d at 936).

Additionally, the record makes clear the victim alleged sexual abuse against the petitioner, and the petitioner confirmed portions of the same during a controlled

---

[1] Tennessee Rule of Evidence 803(26) allows the introduction of a witness's prior inconsistent statement as substantive evidence if it is otherwise admissible under Rule 613(b), the declarant testifies and is subject to cross-examination about the statement, the statement is recorded, signed, or given under oath, and the judge finds by a preponderance that it is trustworthy. Rule 613(b) provides that extrinsic evidence of a prior inconsistent statement is not admissible until the witness has an opportunity to explain or deny it and the opposing party has an opportunity to question the witness about it. Tennessee law provides that such extrinsic evidence "remains inadmissible when a witness unequivocally admits to having made the prior statement." *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998). Petitioner's position, at post-conviction and before this Court, is that counsel should have objected to the admission of the victim's prior statements on the basis that they were cumulative and consistent with her admission to having given them.

telephone call with the victim. At trial, the victim recanted some of her allegations but did not deny making the prior allegations of abuse against the petitioner. The defense attempted to highlight portions of the victim's varying stories in an effort to demonstrate their theory of the case, that the victim was motivated to allege abuse against the petitioner in the past. The jury, however, ultimately rejected the defense theory and nothing in the record suggests the outcome of the petitioner's trial would have been different had trial counsel pursued a different objection to or a limiting jury instruction on the victim's prior statements. *Strickland*, 466 U.S. at 694. The petitioner is not entitled to relief.

## II. Reviewing the Victim's Journals

The petitioner next argues trial counsel failed to fully investigate his case by not reviewing all of the victim's journals prior to trial. The State asserts trial counsel's investigation into the victim's journals "was satisfactory under the circumstances," and we agree. In reviewing this issue, the post-conviction court determined trial counsel were not deficient in failing to review the entirety of the victim's journals prior to trial because "[u]ntil [the victim] recanted, neither the State nor the defense team expected those journals to be a part of the proof against the [p]etitioner." As such, the post-conviction court found "it is within the range of competency for an attorney preparing for trial to not invest a significant amount of his or her necessarily limited time and energy reviewing voluminous journal entries that neither party expected to contain additional relevant evidence or to be a portion of the State's case against the [p]etitioner." The postconviction court further held the petitioner failed to show he was prejudiced by trial counsel's failure to review the entirety of the journals because lead counsel "swiftly incorporated many of the new journal entries as supportive of the defense's theory of the case that [the victim] had recently fabricated the allegations."

Upon our review of the issue, we agree with the post-conviction court. At the evidentiary hearing, local counsel stated he reviewed "the most damaging portions" of the victim's journal entries prior to trial and lead counsel believed he did the same. Though neither counsel remembered reviewing the entirety of the journal entries in the property room prior to trial, the record indicates trial counsel were aware of the victim's prior statements and prepared the defense of the petitioner accordingly. As noted above, both lead and local counsel testified they engaged in thorough communications with the petitioner and learned his explanations for the allegations of abuse. After doing so, trial counsel made the strategic decision to present a defense wherein they attempted to identify the victim's motives for making false allegations against the petitioner. Though the jury did not agree with the defense theory, nothing in the record indicates trial counsel were deficient by failing to review the entirety of the victim's journals. Rather, the record shows trial counsel were aware of the victim's prior statements, including the ones made in the journals, which they used to support their defense theory. Though the petitioner argues a more thorough investigation into the victim's journals would have changed the outcome of his trial, we are not persuaded. The entire defense strategy relied on the theory that the victim fabricated the allegations against the petitioner, and trial counsel utilized the victim's journals to that end. The petitioner is not entitled to

relief.

Similarly, the petitioner asserts trial counsel were ineffective for not putting forth evidence of the blank journals the petitioner found in the victim's room as corroborating evidence of the victim's "trial testimony of a scheme to fabricate journal entries." As to this issue, the post-conviction court stated: "There is absolutely nothing unusual about the fact that a teenage girl, who regularly journaled, would have additional blank journals in her room. Thus, the [c]ourt finds that the [p]etitioner was not prejudiced in this respect by trial counsel's failure to review all of the journals." Again, we agree. Nothing in the record demonstrates trial counsel's strategy regarding the victim's journals was not sound, and the petitioner has failed to show that trial counsel's strategy regarding their review of the journals amounted to deficient performance. *Strickland*, 466 U.S. at 689; see Tenn. Code Ann. § 40-30-110 (f); *Goad*, 938 S.W.2d at 369. The petitioner is not entitled to relief.

III. Right to Testify

Finally, the petitioner argues trial counsel was ineffective for failing to adequately consult with him regarding his right to testify, arguing "he had a lot to offer his defense had he taken the witness stand during trial." In reviewing this issue, the post-conviction court found "the case was presented according to the [p]etitioner's wishes and that he was extensively involved in all such decisions." Our review of the record reflects that of the post-conviction court.

As explained at the post-conviction hearing, after preparing the petitioner's case for trial, local counsel advised the petitioner not to testify. Lead counsel agreed and advised the petitioner of the same. The petitioner stated he decided not to testify after hearing the victim recant at trial and discussing the same with trial counsel. After doing so, the petitioner engaged in a *Momon* colloquy[2] and relinquished his right to testify. Trial counsel explained, and it is evident in the record, the petitioner was very involved in the preparation of his defense, and he communicated freely with trial counsel throughout their representation. The post-conviction court accredited trial counsel's testimony, and nothing in the record preponderates against its factual findings. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Therefore, in reviewing the record as a whole, it is clear the petitioner waived his right to testify after discussing his options with trial counsel. Further, the record indicates the petitioner engaged in a *Momon* hearing during which he affirmed he understood his options regarding his right to testify and waived the same. *Momon v. State*, 18 S.W.3d 152, 163 (Tenn. 1999). The petitioner is not entitled to relief.

At the post-conviction hearing, the petitioner offered his explanation of the allegations against him which he would have testified to at trial. However, in doing so, the petitioner admitted to touching the victim's hymen, to taking "naked naps"

---

[2] In *Momon v. State of Tennessee*, 18 S.W. 3d 152 (Tenn. 2000), the Tennessee Supreme Court held that a defendant's constitutional right to testify should be safeguarded by hearings demonstrating on the record that any waiver of that right is intentionally made by the defendant personally. Those hearings are commonly referred to in Tennessee as "*Momon* hearings."

with the victim, and to having an erection during a nap with the victim. Though the petitioner believes he could have justified his actions by explaining his "purity" beliefs to the jury, we are not convinced. As noted by the post-conviction court, "the State's case was very strong" against the petitioner, and the petitioner's proposed trial testimony would not have overcome the overwhelming amount of evidence presented by the State which included the petitioner's own admissions to the abuse of the victim. The petitioner is not entitled to relief as to this issue.

(Doc. No. 13-24 at 28–31.)

As the Court understands Petitioner's arguments, the claims exhausted in state court pertaining to counsel's handling of the admissibility of the victim's forensic interview and previous testimony comprise his current Claims 2.1, 2.2, 2.5, 2.7, and 2.8 as they are identified above. Petitioner argues that the rejection of those claims by the state appellate court during post-conviction proceedings was unreasonable because it somehow contradicted that court's ruling on direct appeal in which he says "the court of appeals recognized the error but could do nothing about it because it was not included in the motion for a new trial." (Doc. No. 1 at 12.) But the Tennessee Court of Criminal Appeals did not find any error on direct appeal in the admission of the victim's prior statements. The court determined that Petitioner had waived the particular issue about admissibility that he asserted on appeal by failing to raise it in the trial court, but it did not express any opinion about whether admission of any of the prior inconsistent statements was error or whether a particular objection would have had any likelihood of changing the outcome of Petitioner's trial. (Doc. No. 13-15 at 18–20.)

The remainder of Petitioner's argument with respect to these claims boils down to an assertion that the state court simply reached the wrong result, but that does not establish that its decision was unreasonable as required to prevail under AEDPA. In addition to its finding that counsel's handling of the previous statements was at least partly strategic, the state court found that Petitioner was not prejudiced as a result of that handling. (Doc. No. 13-24 at 28–29.) And Respondent correctly points out that even if—as Petitioner maintains—Tennessee's Rules of

40

Evidence precluded admission of the recorded statements themselves, the prosecutor could have gotten the same information before the jury by painstakingly asking the victim to confirm having made the previous statements line-by-line. (*See* Doc. No. 20 at 52.)  That method would have been more laborious and perhaps less impactful for the jury.  But there is no reason to believe that it would have produced a different result, especially when combined with the other evidence against Petitioner, including his own statements during the recorded phone call with his daughter.  Accordingly, the state court's finding that Plaintiff suffered no prejudice in connection with these claims is not unreasonable, and he is not entitled to relief on Claim 2.1, 2.2, 2.5, 2.7, or 2.8.

Claims 2.3 and 2.11 raise Petitioner's exhausted issues about counsel's alleged failure to examine and prepare to rebut the use of the victim's journals.  As quoted above, the state court found that counsel's performance with regard to the journals was not objectively deficient and that Petitioner was not prejudiced by that performance. (Doc. No. 13-24 at 29–31.)  Petitioner clearly disagrees with those determinations.  He argues that "[b]ecause counsel failed to examine the journals prior to trial," they were unaware of "the <u>specific</u> content of the journals until trial." (Doc. No. 10 at 11.)  But he does not explain what additional use counsel should have made of the victim's journals or how that use would have affected the outcome of his case.  He does not, for example, identify any passages of the journals that should have been used in cross-examination or discuss what effect they would have had.  He also repeatedly complains about counsel's failure to use the blank journals and box of pens he found in the victim's room as evidence of her fabricating the damaging journal entries. (Doc. No. 1 at 11; Doc. No. 10 at 11.)  But counsel elicited testimony from the victim at trial about having faked her journals and how she used multiple pens to do so. (Doc. No. 13-4 at 85.)  Offering empty journals and pens into evidence would have been minimally effective at best to corroborate that testimony, given that—as the state court observed—one would

expect to find those items in the room of anyone who keeps journals. Thus, regardless of whether counsel performed deficiently in failing to examine the journals in their entirety prior to trial, the state court's determination that Petitioner was not prejudiced by that failure is reasonable.

Petitioner includes in Claim 2.10 his exhausted claim about counsel's alleged failure to communicate with him about whether he would testify at trial. When counsel announced at trial that Petitioner would not testify, the trial judge had Petitioner sworn in and prompted counsel to have the following colloquy with him out of the presence of the jury:

> Mr. Horst: Mr. Hochhalter, please state your name for the record.
>
> Defendant: Darrell Dean Hochhalter.
>
> Mr. Horst: You are the defendant in this cause?
>
> Defendant: Yes, sir.
>
> Mr. Horst: And do you realize that you do have the right to testify in this case in your version of events to the jury?
>
> Defendant: Yes, sir.
>
> Mr. Horst: And do you also realize you have the right not to testify and the Court will instruct the jury that they are not to infer anything about your decision not [to] testify?
>
> Defendant: I do, yes, sir.
>
> Mr. Horst: Okay. And do you understand that it is your right and your right alone, and while Mr. Slovis and I can give you advice, it is your decision whether you testify or not; do you understand that?
>
> Defendant: Yes, I do.
>
> Mr. Horst: And based upon all of those things, what is your decision? Do you wish to testify or not testify in [this] case?
>
> Defendant: To not testify.

(Doc. No. 13-6 at 56–57.) It is therefore clear that Petitioner personally, willingly chose not to testify at trial.

Nevertheless, Petitioner suggests that his choice was made based on ineffective advice from counsel. He argues that counsel "breached his duty to consult with Petitioner on the case and to have meaningful discussions concerning whether to testify or not." (Doc. No. 10 at 10.) He

42

says that counsel advised him that there was no need for him to testify in light of the victim's recantation and that they did not discuss the testimony he could offer about: (1) the victim's journal entries, (2) his statements during the recorded phone call, (3) his own credibility and lack of a criminal record, (4) "other explanations Petitioner could offer if he testified." (*Id.* at 11.) He says that counsel also did not discuss with him the dangers of testifying, including cross-examination or opening the door to more damaging evidence. (*Id.*) Counsel testified at the post-conviction hearing that Petitioner had "more than average" participation in discussing and making decisions about how to proceed in his case. (Doc. No. 13-20 at 53.) And Petitioner acknowledged that he had spoken with counsel "numerous times" while his case was pending—so many times that he "wouldn't dare put a number" on it. (*Id.* at 80, 85.) The state courts accredited the testimony to the effect that Petitioner was "very involved in the preparation of his defense" and reasonably concluded that "it is clear the petitioner waived his right to testify after discussing his options with trial counsel." (Doc. No. 13-24 at 31.) The Court has no basis for finding that determination unreasonable.

Moreover, even if this Court accepted at face value Petitioner's testimony that neither of his attorneys had a substantive discussion with him about the possibility of testifying, he was not prejudiced by that failure unless he can demonstrate that he would have offered testimony that was reasonably likely to lead to his acquittal. Petitioner fails woefully to meet that standard. When asked at the post-conviction hearing what his testimony would have been, he began by accusing the victim of being "very flirty" and "promiscuous." (Doc. No. 13-20 at 95.) He acknowledged looking into his daughter's vagina and telling her that her hymen was "thick and beefy." (*Id.* at 96.) He acknowledged napping nude in bed with his daughter and waking up with an erection. (*Id.* at 96–97.) He acknowledged that he "examined" the victim when she was naked getting out

of the shower. (*Id.* at 97.)  In effect, his testimony would simply have reiterated his statements during the recorded call except for his alleged motivation for looking at the victim's hymen: instead of sincerely wanting to check the status of her hymen, he testified that he simply wanted to convince the victim that it would be painful if she had sex. (*Id.* at 95–96.)  Even without considering the damage that cross-examination might have done to Petitioner's story or the additional evidence to which he might have opened the door, there is no reasonable likelihood that this proposed testimony would have changed the outcome of his case.

The Court observes that the Tennessee Court of Criminal Appeals erroneously stated that Petitioner admitted at the post-conviction hearing to "touching" the victim's hymen. (Doc. No. 13-24 at 31.)  Petitioner actually admitted at the hearing only that he "looked." (Doc. No. 3-20 at 96.)  But viewing the record and the state court's analysis in its entirety, its rejection of Petitioner's claim was not "based on" that single mistake.  Accordingly, it does not warrant relief under § 2254(d)(2).

2.  <u>Defaulted Claims</u>

Petitioner's three remaining enumerated claims are that counsel failed to call any witnesses (2.4), failed to investigate records of the victim's kidney surgery (2.6), and failed to move for a bill of particulars (2.9). (Doc. No. 1 at 9.)  Those claims are not properly exhausted because Petitioner did not include them in his post-conviction appeal. (Doc. No. 13-21 at 19–28.)  A petitioner does not exhaust his state remedies for all ineffective assistance of counsel claims if the state courts are presented with only one aspect of counsel's performance. *Pillette v. Foltz*, 824 F.2d 494, 497-98 (6th Cir. 1987).  Because Petitioner has not fully and fairly presented these claims to

the state courts and is now precluded from doing so by state procedural rules,[3] the claims are deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53; *Atkins v. Holloway*, 792 F.3d 643, 657 (6th Cir. 2015). Thus, federal habeas review of the claims is barred unless the petitioner can demonstrate that cause and prejudice will excuse the procedural default or that failure to consider the claims will result in a fundamental miscarriage of justice. *Benton v. Brewer*, 942 F.3d 305, 307 (6th Cir. 2019); *Dretke v. Haley*, 541 U.S. 386, 392 (2004).

In some circumstances, the ineffectiveness of post-conviction counsel can establish cause "to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez v. Ryan*, 566 U.S. 1, 17 (2012). But ineffective assistance of post-conviction counsel can act as cause only when the ineffectiveness occurs at the initial review stage, not the appeal stage. *Atkins*, 792 F.3d at 661 (emphasis added) (quoting *West v. Carpenter*, 790 F.3d 693, 699 (6th Cir. 2015)) ("[A]ttorney error at state post-conviction appellate proceedings cannot excuse procedural default."). Petitioner raised his claim about the failure to file a bill of particulars in his post-conviction petition, and the post-conviction trial court rejected it on its merits. (Doc. No. 13-19 at 56; Doc. No. 13-19 at 84–85.) Accordingly, because Petitioner defaulted Claim 2.9 on post-conviction appeal, *Martinez* does not apply to it, and it is procedurally defaulted and not subject to habeas review.[4]

---

[3]     Any effort by Petitioner to raise these claims in state court now would be untimely and precluded by Tennessee's "one-petition" limitation on post-conviction relief. Tenn. R. App. P. 4; Tenn. Code Ann. §§ 40-30-102(a), (c).

[4]     To the extent that Petitioner's submissions can be read to include a claim that counsel was ineffective for failing to offer evidence that it was "physically impossible" for a man of Petitioner's 6'2" height to thrust his pelvis while in a bathtub (*see* Doc. No. 10 at 10), that issue was also raised in the post-conviction petition but defaulted on post-conviction appeal. (*See* Doc. No. 13-19 at 57.) Accordingly, it is not subject to habeas review.

45

Petitioner's claims that counsel was ineffective for failing to call witnesses or investigate the victim's medical records were not raised in his initial-review post-conviction proceeding. Thus, in theory, *Martinez* may apply to excuse their default. To determine whether Petitioner has effectively demonstrated cause under *Martinez*, the Court considers "(1) whether state post-conviction counsel was ineffective; and (2) whether [Petitioner's] claims of ineffective assistance of counsel were 'substantial.'" *Atkins*, 792 F.3d at 660 (citations omitted). For the purposes of *Martinez*, "[a] substantial claim is one that has some merit and is debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (citing *Martinez*, 566 U.S. at 14). On the other hand, a claim is not substantial "when 'it does not have any merit,'" or when it "'is wholly without factual support.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16). If Petitioner demonstrates cause, then the Court must consider "whether [he] can demonstrate prejudice." *Id.* And if Petitioner establishes both "cause" and "prejudice," only then would the Court "evaluate [his] claims on the merits." *Id.* (citations omitted).

Petitioner complains that counsel did not call his wife, the victim's grandmother, or two friends as witnesses at trial. (Doc. No. 1 at 11.) He attaches a handwritten statement from his wife, which says that she and her mother, who lived with the family at the time of the relevant events, were never interviewed by Petitioner's attorneys and that she was at trial every day and available to testify. (Doc. No. 1 at 29–30.) Petitioner's wife acknowledges in her statement that she entered a best-interests plea to at least one criminal charge in connection with the victim's reports. (*Id.* at 30.) Neither the statement nor the Petition indicate what the wife's proposed testimony at trial would have been or how it would have affected the outcome of trial. With his Reply, Petitioner submitted a second statement from his wife in which she "reaffirm[s her] testimony from family

court" and that her testimony "would have supported" that of the victim at trial and "would have supported [her] husband's innocence." (Doc. No. 23-1 at 8.) But the family court testimony in question is not in the record before this Court. Moreover, Petitioner's wife was not alleged to be present for any of the seven incidents that formed the bases of the charges against Petitioner, all of which happened when Petitioner was alone with the victim. (*See* Doc. No. 13-8 at 6 (trial court's instructions regarding the state's election of offenses).) Petitioner has not established, therefore, that any testimony his wife could have given would have been helpful at trial, particularly in light of her own plea.

Similarly, Petitioner has not offered any summary of proposed testimony from the grandmother or the friends he faults counsel for failing to call as witnesses. "To present an ineffective assistance of counsel claim based on a failure to call a witness, a defendant must make an affirmative showing as to what the missing evidence would have been and prove that the witness'[s] testimony would have produced a different result." *Malcum v. Burt*, 276 F. Supp. 2d 664, 679 (E.D. Mich. 2003) (*citing United States ex. rel. Jones v. Chrans*, 187 F.Supp.2d 993, 1009 (N.D. Ill. 2002)). Petitioner fails to make that showing. Accordingly, Claim 2.4 lacks any factual support and is not sufficiently substantial to overcome its default pursuant to *Martinez*.

Petitioner explains his claim about counsel's failure to use records of the victim's childhood surgery as follows:

> Mr. Horst was also made aware of the surgeon's notes from Vanderbilt Hospital records where Dr. Breren (pediatric urologist) recorded the existence and removal of a hymeneal band during a surgery when [the victim] was 3 years old. These notes, that could have helped explain some of the petitioner's actions, were not available for trial because Mr. Horst told his client that they were pointless. They were therefore never seen by the jury.

(Doc. No. 10 at 12.) He has also submitted copies of the medical records in question, confirming the discovery and incision of a hymenal band in the course of surgery to remove her right kidney.

(Doc. No. 23-1 at 20–24.) But Petitioner's own claim establishes that counsel was aware of the records and made the strategic decision that their introduction at trial was "pointless." Such informed "strategic choices" by counsel "are virtually unchallengeable." *Strickland*, 466 U.S. at 690-91.

Moreover, counsel elicited testimony from the victim on cross-examination at trial about the surgery and the belief that "there was nothing sexual about" her father's examination of her hymen. (Doc. No. 13-4 at 60–63.) That purported explanation for Petitioner's looking into his daughter's vagina was corroborated by Petitioner's comments during the recorded phone call (*see* Doc. No. 13-7 at 41–42) and by the victim's statements during her forensic interview (*see* Doc. No. 14, Trial Exhibit 2 video at approx. 10:23.) Accordingly, Petitioner's explanation for his behavior was already in the record, and it is not clear what benefit he believes he would have garnered from the additional corroboration of the medical records. There is no reasonable likelihood that further proof of the victim's childhood surgery would have caused the jury to credit Petitioner's explanation about checking her hymen. The jury's verdict almost certainly did not turn on whether the victim had a surgical procedure as a young child but on whether Petitioner— who admitted during the recorded call to being chronically sexually aroused by his daughter— looked at her genitalia for the purpose of sexual gratification despite his explanations. Claim 2.6 is thus not sufficiently substantial to overcome its default pursuant to *Martinez*.

Petitioner also makes unexhausted allegations, apparently under the umbrella of Claim 2.11, that counsel was ineffective for failing to introduce Petitioner's own medical records and emails between the victim and her friends. Petitioner's records (Doc. No. 23-1 at 25–34), presumably intended to corroborate his claim of erectile dysfunction, would only have drawn more attention to his statements during the recorded call about being so aroused by the victim that he

48

became dysfunctional with his wife. And the emails in question (Doc. No. 23-1 at 9–19) would have similarly drawn more attention to Petitioner's alleged beating of his daughter and do not comment one way or another about sexual abuse. Neither of those issues is sufficiently substantial to garner further review under *Martinez*.

Finally, Petitioner alleges that the cumulative effect of counsel's ineffectiveness deprived him of a fair trial. This claim fails on habeas review for at least two reasons. First, cumulative-error claims are not cognizable on habeas review because the Supreme Court has never held that cumulative errors may form the basis for issuance of a writ of habeas corpus. *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). And second, the state court held that trial counsel did not commit any constitutional error in his representation of Petitioner, and this Court has found those rulings to be reasonable. Accordingly, there are no instances of ineffectiveness that could have had a cumulative effect on the outcome of Petitioner's case.

Petitioner is not entitled to relief on Claim 2 under AEDPA.

## C.  Claim 3 — Actual Innocence

Finally, Petitioner asserts his actual innocence as a basis for habeas relief. (Doc. No. 1 at 14.)  But actual-innocence claims are not a basis "for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) (noting that a free-standing claim of actual innocence is not cognizable on habeas review). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." *Herrera*, 506 U.S. at 400. Accordingly, this claim is not cognizable.

Moreover, for the reasons explained in the Court's analysis of Claim 1 above, Petitioner has not demonstrated that he is actually innocent of the crimes for which he was convicted. Accordingly, to the extent Petitioner attempts to claim innocence in order to invoke the "miscarriage of justice" exception to overcome default of any of his claims, the Court rejects that argument. In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court held that a habeas corpus petitioner should be permitted to argue the merits of defaulted underlying claims where he "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.* at 316. The threshold inquiry is whether "new facts raised sufficient doubt about [Petitioner's] guilt to undermine the confidence in the result of the trial." *Id.* at 317; *Reeves v. Fortner*, 490 F. App'x 766, 769 (6th Cir. 2012). Nothing Petitioner has presented in this case raises sufficient doubt to undermine confidence in his convictions.

Petitioner is not entitled to relief on Claim 3.

## VI.     CONCLUSION

Petitioner's habeas claims fail on their merits or are foreclosed from habeas review for the reasons set forth above. Accordingly, the Court will deny the requested relief and dismiss the Petition.

An appropriate Order will enter.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

50